Milligan, J.,
delivered the opinion of the court:
The claimant seeks to recover in this action the proceeds of eighty-three bales of cotton, of which he claims to have been the owner at the time of the capture of Charleston, South Carolina, by the United States military forces, in February, 1865. The action is brought under the third section of the act of March the' 12th, 1863; and we find the ultimate facts of the case to be as follows:
1. The claimant is a citizen of the United States, and formerly a resident of the State of Vermont, but for several years last past, a citizen and resident of the city of Charleston, in the State of South Carolina. He claims eighty-three bales of upland cotton, but proves that he was the owner of only eighty-two bales, which were seized, and shipped to New York, and there sold, and the proceeds paid into the Treasury.
2. The cotton in question was purchased in two lots. One of fifty-five bales; from L. D. Mowry & Co., on the 9th of January, 1865; and the other fifty bales of E. Fourgeaud, on the *573 20th of tbe same montli. Fourgeaud testifies to bis own complicity witb tbe rebellion, and there is no evidence showing tbe loyalty of any of tbe members of tbe firm of Mowry & Co., from whom tbe larger lot was purchased.
3. Public sentiment in Charleston was very generally in favor of secession and tbe war; and all who opposed it were placed under censure and great surveillance exercised over them. Through fear of personal violence they were compelled to refrain from acts of loyalty to tbe United States, or even tbe open expression of sentiments favorable to tbe Union.
4. Tbe claimant is shown to have opposed secession in its inception, and in sentiment to have been loyal to tbe government of tbe United States throughout tbe war.
5. He did many acts of kindness to Federal prisoners, brought into Charleston, some of which were performed under circumstances of personal danger, which reflect credit on him as a man of kind and sympathetic nature.
6. When the national troops entered the city he received them with apparent gratitude, and guided them through the city to the arsenal, with the view of protecting it against threatened destruction by the retiring rebel soldiery.
In addition to these facts, which tend strongly to establish the claimant’s loyalty, we also find the following countervailing facts:
1. Claimant is shown to have been a man of wealth, and, at the breaking out of the war, largely engaged as a clothing merchant, which he continued until about the time of the surrender of the city.
2. Early in the war he was a member of a fire company in the city of Charleston, which was called upon sometimes to do guard duty for the protection of the city.
3. He voluntarily sought and accepted a clerkship in the Confederate treasury department, which he held for several months, but appropriated his salary to other rebel employés in the department. In his own deposition, which, under the statute and the order of the court, is put in evidence by the special counsel for the United States, he claims that his services in the fire company and the treasury department were merely subterfuges to avoid field duty in the rebel army.
4. In 1862, or early in 1863, under the apprehension that he would be conscripted, he placed a substitute in the Confeder *574 ate army; and shortly thereafter he was himself exempt, on account of ill health, by a medical board, from all military service; when he immediately left the treasury department, but continued in the pursuit of his private business;
5. The claimant’s own deposition discloses the fact that he speculated in blockade stocks, which is amply corroborated by other testimony in the cause.
6. He is shown to have had large interests in blockade companies, one of which was largely engaged in running out cotton, and bringing in supplies, provisions, shoes, dry goods, &c., &c. His interest in the Atlantic Company is proven to have existed as late as the fall of 1864.
7. He owned $4,000 of stock in the Cobia Blockade Company, and $10,000 in the Palmetto Company, and received dividends upon it.
8. The Palmetto stock was voluntarily purchased by the claimant from a gentleman in Alabama, and held by him up to the close of the war.
9. He received through the blockade articles for private use for himself and friends; and was otherwise complicated with this illicit and illegal trade.
On these facts, anomalous and contradictory as they are, various legal questions are presented for our determination.
1. It is assumed that the claimant’s title to the cotton in question was invalid, and therefore this action for the proceeds of its sale cannot be maintained.
This proposition is rested on the sixth section of the Act of Congress, approved July the 11th, 1862, (12 Stat. L., p. 589,) which is in the following language: “ That if any person within any State or Territory of the United States, other than those named as aforesaid, after the passage of this act, being engaged in armed rebellion against the government of the United States, or aiding or abetting such rebellion, shall not, within sixty days after public warning and proclamation duly given and made by the President of the United States, cease to aid, countenance, and abet such rebellion, and return to his allegiance to the United States, all the estate, property, money, stocks, and credits of such person, shall be liable to seizure as aforesaid, and it shall be the duty of the President to seize and use them as aforesaid, or the proceeds thereof. And all sales, transfers, or conveyances, of any such property after the expiration of the *575 said sixty days from tbe date of such warning and proclamation shall be null and void; and it shall be a sufficient bar to any suit brought by such person for the possession or use of such property, or any of it, to allege and prove that he is one of the persons described in this section.”
In pursuance of the provisions of this section, the President of the United States, on the 25th of July, 1862, issued his proclamation warning all persons within the contemplation of this section to cease participating in, aiding, countenancing, or abetting the rebellion, and to return to their proper allegiance to the United States, on pain of the forfeitures and seizures as within and by said sixth section provided.
It will be observed that the sixty days limited in the act under the proclamation expired on the 23d of September, 1862, and the sales of the cotton under consideration were made respectively on the 9th and 20th of January, 1865.
The sales being after the 23d of September, 1862, the question is presented whether or not they were under the statute and proclamation null and void? There is no evidence that the parties from whom the claimant purchased availed themselves of the benefits of the proclamation, but, on the contrary, one of the vendors is shown since to have been engaged in the rebel service. Then, was the sale void, or inoperative to pass the title to the claimant? We think not. This qiiestion was presented in another case on a former day of the present term, and we held that the sale was not ipso facto void under the act of Congress and the President’s proclamation, and we have now no disposition to disturb that decision.
It is obvious that the cotton was liable to seizure, but the seizure did not divest the title or authorize the United States to sell it, until after condemnation by the judgment of the district or territorial courts of the United States. (Act of July 17, 1862, § 7.)
The sale, if bona fide, was good between the parties, and operated to vest the title in the purchaser. No one could have taken advantage of it under the statute but the United States, and they only in the manner pointed out by law. The court pronouncing the judgment of condemnation and ordering the sale must first find the property seized “to have belonged to a person engaged in rebellion or who has given aid and comfort thereto;” and when that fact is judicially ascertained the *576 rig-lit attaches in the United States to condemn and sell the property, and no subsequent sale or transfer by such disloyal owner can defeat the forfeiture. The proceeding is in rent, and the forfeiture in consequence of the crime of the lawful owner when such crime was committed, and he cannot avoid its punishment by a transfer of his property.
But in this case the United States have waived their right to take advantage of the sale of the cotton to the claimant, and to confiscate it under the act of July 17,1862, as the property of the disloyal vendors, and they cannot now, in this proceeding, avail themselves of the benefit of the sixth section of the act of 1862, and on that ground defeat the claimant’s right to recover the proceeds of the sales of his cotton now carried into the Treasury. The United States, waiving all their rights under the confiscation acts, seized the cotton, and by the act of March 12th, 1863, kindly tender to the lawful owner the right to come into this court, establish his loyalty and right to receive the proceeds of the sale, and we are bound, in such case, to render judgment therefor without any embarrassment from the provisions of the act of July 17th, 1862.
2. It is assumed that under the proviso contained in the twelfth section of the act of 3d March, 1863, (12 Stat. L., p. 765,) the claimant does not show a loyal title to the cotton claimed, and on that ground, also, the action must fail.
The facts already shown make it clear that one of the parties from whom the pinchases were made was disloyal to the United States, and the record is silent as to the political status of the others. Their voluntary residence, however, in the revolted States, raises, under the act of Congress, the presumption of disloyalty against them; and for all the purposes of this question, the vendors of the cotton stand on the same footing.
The proviso relied on declares: “That in order to authorize the said court to render a judgment in favor of any claimant, if a citizen of the United States, it shall be set forth in the petition, that the claimant and the original and every prior owner thereof, when the claim has been assigned, has at all times borne true allegiance to the government of the United States, and, whether a citizen or not, that he has not in any way voluntarily aided, abetted, or given encouragement to rebellion against the said government; and if on the trial such issue *577 shall be decided against the claimant, his petition shall be dismissed.”
The language of this provision of the statute, as well as its reason, limits its operation to claims against the United States. The claim prosecuted in -this action was never in existence until after the seizure of the cotton, and there has been no assignment or transfer of the claim to or by any person since it accrued, and consequently the proviso can have no application to this case.
We do not feel authorized to extend the meaning of this proviso beyond the plain interpretation of the language employed by the legislature, and therefore we limit its operation and effect to the transfer, or assignment of claims which have accrued against the government, but not including the transfer, or assignment of the property out of which the claim arose prior to its seizure.
3. Next, it is insisted that the cotton was purchased in view of the fall of Charleston, and with intent to cover up the property and defraud the United States of its-lawful right of capture.
To sustain this proposition it is shown that the city of Charleston was captured on the 17th of February, 1865, and that the sales of the cotton bear date respectively on the 9th and 20th of January, 1865. The near approach of the Federal army to the city of Charleston, at the dates of the sales, is unquestionably a circumstance to which this court will look, in judging of the lona fieles the transaction; but of itself, this fact is not sufficient to justify us in holding that the sales were merely colorable. The rule of this court as laid down in the Margaret Bond Case, (2 O. Cls. R, p. 532,) is as follows: “The claimant seeking to recover the proceeds, must show not only that he purchased the property, but he must satisfy us that he did so in the regular course of his business, and not in fraud of the statute, or with the view of speculating upon the justice of the government.” Fraud will not be presumed, but it is incumbent on the claimant in every case to show a valid title to the property, the proceeds of which he claims; otherwise if it appears from the facts and circumstances that fraud intermingles with the transaction, this court is bound under the eleventh section of the act of March 3, 1863, to declare the claim forfeited to the government.
*578 Iii tliis case, independent of the time at which the purchases were made, there is nothing in the record which impeaches the validity of the contracts. The cotton appears not to have been purchased under any special circumstances, or contrary to the ordinary course of the claimant’s business, and we therefore hold that the sale was bona fide, and with no'intention to cover up the true ownership of the cotton in question, or to defeat the United States in their lawful right of capture.
4. It is further insisted that this action cannot be maintained' on account of the disloyalty of the claimant.
The facts found by the court present the claimant in a most anomalous light. ■ He is proven to have been in opinion and sentiment loyal to the flag of his government, but to have done many things calculated to give aid and comfort to its enemies. How such an inconsistent life — by assuming the claimant’s professed devotion to the Union to have been sincere — can be accounted for, is a little difficult to determine. It may be that the- allurements of private speculation, for the time, extinguished his zeal for the safety of his government. But that patriotism which, in time of war, exalts the man and sinks the State, is not such patriotism as commends itself to this court.
The rule governing our action in cases of this character, has been so clearly announced in Margaret Bond’s Case, (2 C. Cls. R., p. 528,) that we cannot do better than to incorporate it in this opinion. The court after describing the various provisions of the act of the 12th of March, 1863, proceeds to say:
"Other provisions of this act might be cited to show that these words have been used by Congress in relation to property, and in a different sense from that in which the same, or nearly identical, words are used in the Constitution and laws of the United States to define the crime of treason and prescribe its punishment. Any acts voluntarily committed, which would tend'to assist, countenance, abet, or encourage the rebellion, are a flat bar to a claimant’s recovery under this law. And to entitle the claimant to recover, the act requires that he should prove, by those -who had the opportunity of observing his conduct, that he did not give such assistance or encouragement to-the insurrection. He must go further. His evidence to that effect must cover the entire period of the war, so that it shall appear that he 'never’ gave any aid or comfort to the rebellion.’'
*579 Tbe facts found in. this case bring- tlie claimant within the rule just quoted. The life of the claimant was not consistently loyal throughout the entire period of the war, and lie fails affirmatively so to prove it. A. preponderance of the proof in favor of the Union is not, as in ordinary civil cases, sufficient •to turn the scales, and entitle the claimant to a standing in this court. He must show that he “Merer” gave any aid or comfort to the rebellion, and that aid or comfort is not measured by its quantity, or the number of times it was repeated. It is enough, in the lauguage of the rule in the Bond Case, if any acts voluntarily “committed tend to assist, countenance, abet, or encourage the rebellion.” • Thus, can we hold that the claimant’s voluntary ■ connection with the A'iolation of the blockade laws, and his heavy investments in stocks designed to Affolate the laAvs of the United States, and to give aid and countenance to the rebellion, do not bring the claimant clearly Avithin the rule long established and acquiesced in by this court ? Certainly not. His service in the Are company and also in the Confederate treasury department, as well as his putting in a substitute, may possibly admit of explanation under the circumstances of this case; but for his connection with the AÚolations of the blockade, there is no excuse or satisfactory explanation given, and we are therefore constrained to hold that he is not entitled to maintain this action, and dismiss the petition.